IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FAIRLY EARLS,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 18-cv-332-wmc |

TIMOTHY DETERS and
SALAMUIIAH SYED,

Defendants.

---

FAIRLY EARLS,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 19-cv-117-wmc |

SALAMUIIAH SYED, TIMOTHY
DETERS, RENEE SCHUELER, ANGELA
HODGE, TERESA GAIER, DENISE
VALERIUS, and RACHEL PAFFORD,

Defendants.

---

Previously incarcerated at Columbia Correctional Institution ("Columbia"), *pro se* plaintiff Fairly Earls was granted leave to proceed in the above-captioned cases on Eighth Amendment and Wisconsin negligence claims, all related to inadequate medical care that Columbia employees allegedly provided Earls in 2017. Due to overlapping parties and facts, the court consolidated these cases for purposes of discovery. In Case No. 18-cv-332-wmc (the "'332 case"), Earls claims that defendants Timothy Deters and Dr. Salam Syed provided inadequate medical care between July and August of 2017 for impetigo, a highly contagious skin infection affecting infants, children and those with compromised immune systems. In Case No. 19-cv-117-wmc (the "'117 case"), Earls claims these same two

defendants, as well as current or former Columbia employees Renee Schueler, Denise Valerius, Teresa Gaier, Angela Hodge, and Rachel Pafford failed to provide adequate medical treatment for a leg injury he sustained during a hospital transport in August of 2017.

Defendants Syed, Schueler, Valerius, Gaier, Hodge and Pafford are represented together by the Wisconsin Department of Justice ("State defendants"), while defendant Deters is represented separately, having worked as a nurse at Columbia under a state contract.  At this point, all defendants in both cases seek summary judgment.  ('332 case, dkt. ##57, 62; '117 case, dkt. ##49, 54).  Moreover, since all events relevant to Earls' claims in both lawsuits occurred between July and September of 2017 and include overlapping defendants and facts, the court will proceed to consider these pending motions in a single opinion and order.  Having now reviewed that evidence of record, the court concludes that no reasonable fact-finder could find that defendants violated plaintiff's constitutional or state law rights with respect to his medical care.  Accordingly, the court will grant defendants' motions in both cases and direct entry of judgment in their favor, thereby closing these cases.

UNDISPUTED FACTS[1]

**A. Parties**

Although plaintiff Fairly Earls is currently incarcerated at Jackson Correctional Institution, he was housed at Columbia between August and September of 2017. All defendants but one were working at Columbia during that time. Specifically, Dr. Syed was a physician; Gaier and Valerius worked as Nurse Clinicians in the Health Services Unit ("HSU"); Pafford was a Medical Program Assistant – Associate ("MPAA"); and Renee Schueler was the Health Services Manager ("HSM"). As noted, defendant Deters was also working as a registered nurse at Columbia under a contract between the DOC and his employer. Finally, defendant Hodge worked as a nurse at Dodge Correctional Institution until December 10, 2017, when she started working in Columbia's HSU as an Assistant HSM.

**B.     Earls' injury and medical care at Columbia**

On August 2, 2017, Earls reported that he was experiencing both back and chest pain, which prompted HSU staff to send Earls to the Divine Savior Hospital in Portage, Wisconsin. After being examined for a few hours, Earls was discharged and returned to Columbia that same day, because the hospital staff determined that Earls' condition did not require further treatment. Relevant to one of plaintiff's claims, the records of Earls' hospital visit do *not* show that he complained about an ankle injury, but Earls now

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record evidence as appropriate.

maintains that he injured his ankle during his being transported to the hospital that morning, and he told a physician about it at the hospital.  The hospital records further show that Earls did not present with any rash or discoloration.

After Earls returned to Columbia that day, Nurse Deters met with him.  Similarly, Deters did not note any skin rash or infection at that time, and Earls did not raise any skin-related symptoms or issues with Deters.  Later that day, Nurse Deters saw Earls for a second time in the HSU in light of his continuing reports of ongoing lower back pain and symptoms consistent with heartburn.  Again, Deters did not note that Earls complained about any ankle injury, in contrast to Earls maintaining he informed Deters of his injured left leg during transport to the hospital and was in severe pain.  Earls' evidence in support of his claim is a progress note from that day, which does not include any mention of Earls reporting an ankle injury to Deters.  (*See* '117 case, Earls Ex. 34 (dkt. #69-33).)  Regardless, Deters provided Earls ibuprofen and Maalox to address his heartburn and GERD symptoms.  Although Deters was not authorized to prescribe Earls medication as an RN, he was authorized to provide over-the-counter medications, such as Tylenol or ibuprofen.

On August 3, Earls was seen by a non-defendant nurse for continued back pain. The notes of that visit show that Earls was seen for back pain alone ('117 case, Ex. 1000 (dkt. #66-1) 5-6, 8).  Earls claims he reported ankle pain, but he cites as evidence a Health Services Request ("HSR"), which he submitted over a week later on August 11 as described below.

On August 4, Nurse Gaier received a formal HSR from Earls, in which he complained that he was "still in severe pain can't walk haven't been able to eat in dining

4

room in three day[s], fever and sweats.  (Follow up on emergency trip to hospital)." ('117 Ex. 1000 (dkt. #66-1) 50.)  However, Gaier attests that because Earls had just been in the emergency room for chest pain, she did not attribute Earls' complaint about not being able to walk to his ankle pain.  Therefore, on August 4, Gaier responded that he was just seen that day, and was scheduled for a later doctor visit.  Gaier further wrote that if Earls' pain worsened, he should notify the HSU.

On August 6, Earls submitted an interview request to the HSU, reporting back and chest pains, as well as his skin condition.  Again, however, Earls did not mention any ankle injury or pain.  On August 7, Earls submitted yet another HSR, this time reporting severe chest pain, continuing back pain, and developing blisters, but once more, he did not mention ankle pain or an injury.  Another HSU staff member responded to the August 6 HSU request.

On August 9, Dr. Syed and Nurse Gaier met with Earls about his continuing chest pain, as well as blisters on his hands and arms.  Dr. Syed believed the blistering was scabies, an itchy skin condition caused by a tiny burrowing mite that can present with a rash and sores.  He therefore initiated the "scabies protocol" by prescribing an antibiotic, clindamycin, and permenthrin cream, which contains chemicals to kill scabies mites and eggs.  Dr. Syed also provided Earls acetaminophen to address his pain.

Both Dr. Syed and Gaier attest that Earls again did not complain about any ankle injury or pain during their August 9 interaction.  While Earls disputes this, he once more cites in support only the August 11 HSR, which is obviously not evidence of Dr. Syed's or Nurse Gaier's knowledge on August 9.

Defendants do not dispute that Earls submitted such an HSR on August 11, at which point Earls claimed that he had a broken ankle.  Defendant Nurse Valerius that HSR on August 12.  Nurse Valerius attests that after receiving the August 11 HSR, she called Earls' housing unit and spoke to Correctional Officer Graff, who told her that Earls had been ambulating on the unit to meals and showers without apparent difficulty.  ('117 case, Valerius Decl. (dkt. #59) ¶ 8.)  As a result, Nurse Valerius responded to the HSR by scheduling Earls for a nursing "sick call" on August 14, while noting that Earls:  had been seen ambulating around his housing unit; had not reported an acute leg or ankle injury during his August 9 appointment; and had an upcoming appointment with Dr. Syed for his rash and back pain.  ('117 case, Ex. 1000 (dkt. #66-1) 53.)  Earls does not dispute the contents of Nurse Valerious's response, but he adds that she did not actually speak with Earls directly; instead, she spoke only to Officer Graff, who is not a medical professional. As for Dr. Syed, he denies reviewing the August 11 HSR.  Dr. Syed further attests that while he worked at Columbia, he did not typically see HSR's from inmates unless they were specifically referred to him by the triaging nurse.

On August 14, 2017, a different, non-defendant nurse met with Earls in the HSU for his ankle pain.  The nurse noted that Earls' hands were red, warm and had white spots with several scabs, causing her to suspect a possible infection and arrange for Earls to be sent to the emergency room that day.  Earls also apparently reported body aches and back pain to hospital staff, but the notes of that visit do *not* include a complaint about an ankle or leg injury.  While Earls was at the hospital, he was diagnosed with the bullous impetigo, a bacterial infection that results in the formation of fluid-filled blisters.  According to Dr.

Syed, impetigo can develop if a patient with scabies scratches and breaks the skin.  Dr. Syed's impression is that the impetigo developed after he examined Earls on August 9.

Regardless of the *cause* of the impetigo, Earls was given an injection of Ancef, an antibiotic, at the hospital and a prescription for Keflex, another antibiotic, when he was released.  However, these discharge instructions did *not* include a pain recommendation prescription or medication.  Earls disputes that no pain medication was prescribed, citing a record from his emergency room visit including a comment that he was "given prescription(s) for treatment of pain."  (*See* '332 case, Pl. Ex. 18 (dkt. #18-18).)[2]

On August 16, Nurse Deters saw Earls in the HSU for a dressing change to his hands.  Because Earls arrived wearing an ACE wrap on his ankle, Nurse Deters examined that ankle, and he noted that there was some swelling but no discoloration or deformity. Deters further noted that Earls had been bearing weight on that ankle and walking well. In contrast, Earls claims that he had no choice but to walk around because no one provided him an assistive device, but he does *not* claim to have detailed the extent of his ankle pain to Deters during their August 16 interaction.  Finally, Nurse Deters attests that no further medical treatment was indicated or necessary on August 16, and further that Earls had access to ibuprofen to address swelling and pain, as well as an ACE bandage for stability.

Earls returned to the HSU for dressing changes again on August 17, 21 and 22.  The notes of those interactions do not include a complaint by Earls about ankle pain or

---

[2] Earls submitted an inmate complaint raising concerns about how staff responded to his need for medical attention related to his skin condition.  On November 7, 2017, that inmate complaint was affirmed, but the affirmance was due to a delay in providing Earls the medication that had been prescribed on August 2, when he first visited the emergency room during the relevant time.

discomfort, although when seen for a follow-up about his hands on August 23, Dr. Syed met with Earls, who reported both low back and left ankle pain.  Dr. Syed also noted that his rash was resolving with no signs or symptoms of cellulitis or swelling.  With respect to his ankle pain, Dr. Syed noted specifically that Earls showed a full range of motion and minimal swelling, so he ordered Earls ibuprofen for that complaint.  Dr. Syed further attests that he was not concerned that Earls' ankle was seriously injured or broken.

On September 1, 2017, Nurse Clinician Gaier responded to Earls' August 31 HSR in which he reported ankle pain, writing that Earls had been seen in the HSU that day and did not take any further action.  According to Gaier, she had met with Earls previously that day because he had reported a knee injury from pushing a meal cart.  Nurse Gaier noted slight inflammation and bruising, but also that the bone felt aligned and intact.  Gaier then advised Earls to monitor his knee, ice it for two days, and update the HSU in a week if it was not improving.  ('117 case Ex. 1000 (dkt. #66-1) 2.)  Once again, Gaier claims that Earls did not mention his ankle during this appointment.  For his part, Earls claims that this interaction did *not* occur, and that Gaier must be describing an interaction with another inmate.  However, Ears does not *attest* that they did not have this interaction, nor does he otherwise suggest that he reported ankle pain to Gaier that day.

Dr. Syed next met with Earls on September 6, 2017.  With respect to his skin, Dr. Syed ordered triamcinolone to address residual eczema.  Because Earls reported continued ankle pain, Dr. Syed also ordered an x-ray, although it was not actually taken that day.[3]

---

[3] Dr. Syed explains that he could not perform the x-ray himself, and he that when he orders an x-ray, a radiologist from MobilexUSA would come to the institution to complete, process and read the x-ray, then provide a report to the HSU for Dr. Syed's review.

After a few days delay, Earls submitted a follow-up HSR on September 10, writing that on September 6, a doctor told him that he was ordering an ankle x-ray and neck ultrasound, and asking about the status of those orders.  Nurse Valerius responded that same day that the x-ray and ultrasound were both coming up that week.

Earls underwent the x-ray of his left ankle on September 12, 2017, and a radiologist's note concluded that the x-rays showed no sign of a break.  ('117 case, Ex. 1000 (dkt. #66-1) 47.)  Earls disputes that result, citing his Exhibits 31 and 32, which appear to be the x-ray images from September 12, and include the note "Follow up fracture from 7 weeks ago per patient."  (*See* '117 case, Pl. Exs. 32, 33 (dkt. ##69-31) 69-32.) However, unlike Ex. 1000, plaintiff's exhibits do not include a note from a radiologist or other medical professional opining that Earls' ankle was actually broken, and Earls does not submit evidence that the radiologist submitted a corrected report stating that there had been a fracture.

Regardless, apparently having heard nothing, Earls submitted another HSR on September 17, 2017, asking about the results of the x-ray, to which Nurse Valerius responded that the doctor had not yet reviewed the x-ray, but that a follow-up would be scheduled to discuss the results.  This was Valerius's last interaction with Earls, having *never* met with him personally about his ankle pain complaints.  Similarly, Dr. Syed never reviewed the actual x-ray images either, but instead reviewed the radiology report, since he is not a radiologist.  Although he has a cursory understanding of how to read x-rays, as Dr. Syed explains, and nothing in the record contradicts this, he is only qualified to review and use radiology *reports* as a standard part of his practice.  As such, Dr. Syed trusted that the

radiologist had correctly read the x-rays, and thus, that Earls' ankle was normal and needed no further care.   The record does not indicate whether, much less when, Dr. Syed communicated to Earls his reading of the radiology report.

What is known from the record is that some eight months later, after many refused requests from staff, Earls was finally allowed to review the x-ray images themselves on May 15, 2018, and he also requested and eventually received copies of those images.   Earls claims that those images show a fracture but fails to cite to admissible evidence beyond the images themselves.   During this period of time, defendant Renee Schueler was working as the HSM Manager.   In that role, she was responsible for coordinating inmate care with the advanced care provider, including the doctors, Nurse Clinicians, dentists, psychiatrists and specialists who work with the Bureau of Health Services.   Schueler attests and the record supports that she did not:   evaluate, diagnose or determine a course of treatment for inmates; schedule inmates to be seen by the HSU; prescribe medications; or directly care for patients.   Thus, Schueler attests that she did not see or respond to any of Earls' HSRs complaining about a broken ankle or ankle pain.   While Earls does not dispute Schueler's description of her responsibilities, he still maintains that she had the authority to permit him to review his x-ray images, which Schueler does not dispute.   Finally, Nurse Hodge was not employed at Columbia until December 2017, and therefore, she was not involved in treating Earls' ankle in August or September of 2017.   However, Earls claims that Hodge was involved in the subsequent "cover up" of his ankle injury by also not providing him with the images of his fractured ankle.

10

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406– 407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  All defendants seek summary judgment on the merits of plaintiff's Eighth Amendment and Wisconsin negligence claims.

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  First, a medical need is "serious" if it:  so obviously requires treatment that even a lay-person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities.  *Gutierrez v. Peters*, 111 F.3d 1364, 1371- 73 (7th Cir. 1997).  Second, "deliberate indifference" is a high standard; it means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Thus, acts of deliberate indifference requires *more than*

11

negligence, or even gross negligence, but requires something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

The threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

Under Wisconsin law, the elements of a claim for negligence are:  (1) a duty of care or a voluntary assumption of a duty on the part of the defendant; (2) a breach of the duty, which involves a failure to exercise ordinary care in making a representation or in ascertaining the facts; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.  *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 307 (1987).

With these elements in mind, the court will now turn to each Eighth Amendment and negligence claims asserted by plaintiff against each individual defendant, beginning

with the '332 case.  For the reasons that follow, the court further find the elements of each claim lacking in at least one respect.

## I.     Case No. 18-cv-332

Dr. Syed seeks summary judgment on all claims against him, pointing out that there is no evidence that he misdiagnosed plaintiff's skin condition or left plaintiff in pain.  There is no genuine dispute that Dr. Syed's first interaction with plaintiff occurred on August 9, just three days after plaintiff originally reported an issue with his skin.  Moreover, no evidence suggests that Dr. Syed's diagnosis of scabies lacked medical judgment; to the contrary, scabies can present as a rash that blisters or develops into impetigo if scratched. Dr. Syed's treatment approach was similarly appropriate in providing an antibiotic and a cream to kill the mites, as well as acetaminophen to address plaintiff's pain.  Plaintiff does not dispute that Dr. Syed provided these interventions, nor has he come forward with evidence that his skin condition had progressed as of August 9 to the point that Dr. Syed knew and willfully disregarded evidence that the antibiotic and cream would not address plaintiff's condition.  The same is true of Dr. Syed's decision to provide acetaminophen for plaintiff's pain; indeed, Dr. Syed's decision with respect to managing plaintiff's pain is entitled to substantial deference.  *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations.").

Similarly, none of Dr. Syed's subsequent interactions with plaintiff about his skin condition suggests deliberate indifference or negligence.  He examined plaintiff on August

23 and September 6, noted plaintiff's improvement, and on September 6, he provided a new ointment to address plaintiff's residual eczema. In contrast, plaintiff submitted *no* evidence calling into question Dr. Syed's treatment decisions or disputing how he actually presented during their interactions. Since plaintiff has not shown that Dr. Syed misdiagnosed or mistreated his skin condition in August and September of 2017, he is entitled to summary judgment on the merit of plaintiff's federal and state law claims.[4]

Nurse Deters also seeks summary judgment because no evidence of record suggests that he either left plaintiff without pain medication, nor that he was aware plaintiff's skin condition needed further treatment or that he consciously disregarded that need. In particular, while Deters acknowledges seeing plaintiff on August 2, 2017, no evidence suggests that plaintiff reported anything other than lower back pain that day, nor that plaintiff presented symptoms requiring treatment for a condition beyond his back and

---

[4] Dr. Syed alternatively sought summary judgment on plaintiff's negligence claim for failing to disclose an expert to establish the applicable standard of care. However, Dr. Syed is entitled to summary judgment for the simple fact that plaintiff has not submitted evidence sufficient for a reasonable jury to find that he mishandled plaintiff's skin condition in *any* way in August and September of 2017. Dr. Syed also touches on, but does not develop, an argument often raised in similar malpractice cases: Wisconsin Statutes Chapter 655 is the exclusive remedy for plaintiff's medical malpractice claims against Dr. Syed. As this court has explained in other cases, Dr. Syed, as an employee of the state, falls outside of Wisconsin's medical malpractice statutory scheme "because § 655 generally does not apply to state employees *at all.*" *Soderlin v. Doehling*, No. 18-cv-899-wmc, dkt. #84, at 3 (W.D. Wis. Oct. 12, 2021) (citing *Smith v. Hentz*, No. 15-CV-633-JDP, 2018 WL 1400954, at *2 (W.D. Wis. Mar. 19, 2018), and *Wisconsin Med. Soc'y v. Morgan*, 2010 WI 94, ¶ 10, 328 Wis. 2d 469, 787 N.W. 2d 22), for the proposition that the provisions of § 655 are not applicable to "state, county, or municipal employees, or federal employees"); *see also Killian v. Nicholson*, No. 17-C-895, 2018 WL 1902587, at *2 (E.D. Wis. Apr. 20, 2018) (Chapter 655 "does not apply to public employees that work for a governmental agency."). Absent new argument or authority calling into question this and other courts' rejection of the state's position, the court does not intend to revisit the interplay between claims against state-employed health care professionals and Chapter 655. Similarly, the court need not address Dr. Syed's alternative qualified immunity argument.

chest pain, and possibly heartburn.  In contrast, Deters provided plaintiff medication and advice to treat his heartburn-like symptoms, as well as ibuprofen, all of which was a completely appropriate handling of plaintiff's symptoms.  No evidence suggests deliberate indifference to a skin condition.

Nurse Deters next examined plaintiff on August 16, *after* his August 14 emergency room visit when he was diagnosed with impetigo.  During that exam Deters changed plaintiff's dressing, noted some swelling but no discoloration or deformity, and took no further action.  However, there is no evidence from which a reasonable jury could find that plaintiff's skin condition required anything more than a dressing change at that point.  Moreover, plaintiff's continued access to ibuprofen would have addressed any swelling.  In short, no reasonable fact-finder could conclude that Deters handled plaintiff's skin condition with deliberate indifference, nor that he breached his duty of care towards plaintiff.  Accordingly, the court will grant Deters' motion for summary judgment as well.

II.     **Case No. 19-cv-117**

In this case, plaintiff maintains that he was injured during his August 2, 2017, transport to the emergency room, and defendants responded with deliberate indifference and negligence.  The State Defendants and Nurse Deters seek summary judgment on multiple grounds, including that no evidence of record supports an inference that any defendant ignored plaintiff's ankle injury, with a particular emphasis on the fact that plaintiff did not actually have a broken bone.  In opposition, plaintiff insists in conclusory fashion that all defendants ignored his broken leg.  Because plaintiff has been unable to produce any evidence that the defendants had reason to believe that plaintiff had broken his ankle, even after x-rays, all defendants are entitled to summary judgment on the merits of those Eighth Amendment and negligence claims as well.[5]

Dr. Syed is entitled to summary judgment because no evidence of record could support a jury finding that Dr. Syed ignored or failed to exercise medical judgment with respect to plaintiff's ankle injury.  As noted above, Dr. Syed saw plaintiff about chest pain and his blisters on August 9, but he does not recall plaintiff bringing up ankle pain or injury, nor do his notes reflect any discussion of that complaint.  In opposition, plaintiff insists that he reported the ankle injury earlier, but his only evidence of record remains his August 11, 2017, HSR report of ankle pain.  Moreover, Dr. Syed attests that he did not see that August 11 HSR, which typically is given to HSU staff to triage, rather than to an advanced health care provider like Syed, and plaintiff has submitted no contrary evidence.

---

[5] Defendants also seek summary judgment as to plaintiff's negligence claims on multiple, alternate grounds, which the court need not reach.

Regardless, when Dr. Syed next examined plaintiff on August 23, less than two weeks later, plaintiff reported ankle pain.  At that point, Dr. Syed examined his ankle, noted a full range of motion and minimal swelling and ordered plaintiff be given ibuprofen. Plaintiff has neither submitted evidence that Dr. Syed's observations were incorrect, nor that Dr. Syed ignored additional symptoms that required more follow-up or interventions. When plaintiff continued to report ankle pain two weeks later, during his September 6 follow-up to address his impetigo, Dr. Syed also ordered an x-ray.  Although an x-ray was not actually taken for another 6 days, on September 12, no evidence suggests that Dr. Syed was responsible for that relatively short delay either.  More importantly, plaintiff offers no evidence that would permit a reasonable jury to infer that Dr. Syed had a reason to question or follow up on the radiologist's conclusion that plaintiff's ankle was neither broken nor presented any other, acute issue.  In fairness, plaintiff suggests that his ankle had time to heal between his August 2nd injury and the September 12th x-ray, but this fails to address the lack of *any* indication of a recent break or severe ankle injury sprain. Even if the court were to credit plaintiff's assertion, *Dr. Syed* was not responsible for any delay associated with taking the x-ray.  Therefore, Dr. Syed is entitled to summary judgment on all claims against him in this lawsuit, both because of a lack of evidence of an unaddressed serious medical need *or* Dr. Syed's deliberate indifference or negligence.

Similarly, Nurse Clinician Valerius seeks summary judgment because her responses to plaintiff's HSRs regarding his ankle were appropriate.  Valerius was the first HSU staff member to respond to plaintiff's reports of an ankle injury after reviewing his August 11 HSR, which stated he had a "broken leg/ankle" and was unable to walk.  While Valerius

did not arrange for plaintiff to be seen immediately, she only made that choice after educating herself about plaintiff's symptoms.  Specifically, she called plaintiff's housing unit and learned from a correctional officer that plaintiff had been seen walking around the unit, as well as to meals and showers without difficulty, and further noted that he had been seen in the HSU on August 9, and records of that examination did not show a complaint about ankle pain.  Those factors led Valerius to believe that since there was no apparent acute issue requiring plaintiff to be seen immediately, and he was scheduled to see a doctor for a follow-up appointment, any exam could await until then, which is how she responded to plaintiff.  However, Valerius did not just stop there; she further scheduled him for a nurse sick call two days later, on August 14.  Although plaintiff disputes that he was able to walk around his unit, he has submitted no evidence disputing Valerius was *told* that he was walking without difficulty.  Thus, based on the information then before her, Valerius's August 12 response does not support a finding of deliberate indifference or even medical negligence.

Valerius also responded to two, other HSRs from plaintiff, but neither response supports a finding of deliberate indifference or negligence either.  In particular, Valerius responded to his September 10 HSR about the timing of his ordered x-ray by writing that it was coming up that week, and the x-ray was indeed taken just two days later.  Then, on September 17, Valerius responded to Earls' HSR asking about his x-ray results, writing that the doctor had not yet reviewed those results but that a follow-up visit would be scheduled upon receipt.  Although no follow-up was actually scheduled, this was because Dr. Syed felt that step was unnecessary in light of the radiologist's conclusion that no serious issue

18

was presented, *and* no evidence suggests that on September 17, Valerius already knew Syed would decide not to schedule a typical follow-up appointment after the receipt of x-ray results. Thus, no evidence would allow a reasonable jury to find that either of Valerius's two September responses to plaintiff consciously disregarded or even mishandled plaintiff's ankle injury. Therefore, she, too, is entitled to summary judgment.

Nurse Clinician Gaier also seeks summary judgment because no evidence supports a finding that she consciously disregarded plaintiff's ankle injury complaints either. Instead, the undisputed facts show that Gaier reviewed plaintiff's August 4 HSR, in which he complained about severe pain, inability to eat, fever and sweats, but did not indicate that plaintiff was reporting ankle pain, much less an inability to walk. Indeed, rather than mentioning an ankle injury, plaintiff indicated in the HSR that he was following up about his August 2 hospital visit related to chest pain. In response, plaintiff presents no evidence to the contrary. Moreover, Gaier responded that he was already scheduled for a doctor visit, which was true, and that he could follow-up if his symptoms worsened. At minimum, this response does not suggest deliberate indifference or negligence to any unreported ankle injury.

Nurse Clinician Gaier's second interaction with plaintiff occurred in person in the HSU on August 9, 2017, when Dr. Syed diagnosed plaintiff with scabies. As with Dr. Syed, no evidence suggests that plaintiff complained of an ankle injury during this interaction. Even if Gaier could somehow be faulted for failing to treat his ankle that day -- which would require some indication that Dr. Syed also mistreated that injury -- no

evidence supports a finding that Gaier was aware of plaintiff's claimed injury in the first place.

Nurse Clinician Gaier's only other involvement in handling plaintiff's complaints of an ankle injury is reflected in her September 1 response to plaintiff's HSR dated August 31, 2017, in which he complained solely of ankle pain.  However, Gaier had just examined plaintiff on September 1, after he reported slamming into a medication cart and hurting his knee, which is an interaction between Gaier and plaintiff reflected in his contemporaneous progress notes from that day.  While plaintiff maintains that Gaier is wrong, and that interaction must have been with another inmate who she examined that day, he does not actually attest that Gaier did not examine him, and instead merely points to the lack of an HSU order showing that Gaier actually prescribed him anything for his ankle pain on September 1.  (*See* Pl. Ex. 37 (dkt. #69-36).)  However, that does not directly dispute Gaier's assertion that she met with plaintiff on September 1, or perhaps someone else did; either way, Gaier had a good faith basis to take no further action with respect to his August 31 HSR.  On this record, therefore, no reasonable fact-finder could conclude that Gaier consciously disregarded or mishandled plaintiff's ankle injury complaints that day.

Next, HSM Schueler is entitled to summary judgment because she was not involved in reviewing *or* responding to plaintiff's HSR's during the relevant time period, nor was she involved in actually treating plaintiff.  Plaintiff does not dispute Schueler's lack of involvement in the events related to his ankle injury; rather, he insists Schueler should be held accountable because she *could* have allowed him to access his medical records.  First,

20

while plaintiff did have to wait a long time to review his records, he has not explained how Schueler as the health services manager thwarted his ability to do so.  Second, and more critically, plaintiff has not explained how the delay in accessing to his records violated his constitutional rights or showed negligence.  Said differently, there is no indication that plaintiff's earlier access to his x-ray images would have impacted his treatment by Dr. Syed or any other health care professionals.  To the contrary, the evidence is that those x-rays show *no* serious ankle injury, much less a broken ankle.

Nurse Hodge is entitled to summary judgment as well because she was not involved in *any* of the events occurring at Columbia between August and September of 2017.  While not disputing that Hodge did not begin working there until December of 2017, plaintiff would still fault Hodge for failing to provide him copies of his x-ray images sooner. However, plaintiff does not detail any communications between him and Hodge related to his requests for access to those images.  Accordingly, she, too, is entitled to summary judgment absent any proof of her personal involvement in the claimed constitutional violation.  *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016)).  In any event, just like Schueler, plaintiff has not explained how Hodge's alleged failure to provide him copies of the x-ray images amounted to deliberate indifference or negligence.

MPAA Pafford is further entitled to summary judgment because no evidence of record suggests that she was personally involved in plaintiff's medical care either.  On the contrary, the undisputed records shows that Pafford is neither a medical professional, nor in a position to provide medical interventions for pain medication or x-ray orders.  Nor is

there any evidence that Pafford knew about, responded to, or handled plaintiff's requests for medical attention.   Instead, plaintiff would apparently fault defendant Pafford for failing to provide his x-ray images to him earlier.   However, having failed to develop the record as to Pafford's personal involvement in plaintiff's requests, there is *no* reasonable basis to infer that he responded with deliberate indifference or negligence to plaintiff's ankle injury.

Finally, Nurse Deters is entitled to summary judgment on the claim that he consciously disregarded plaintiff's ankle injury.[6]  The first time Deters even learned about plaintiff's injured ankle was August 16, 2017, when he changed plaintiff's hand bandages and saw he was wearing an ACE wrap on his ankle.   There is no dispute that Deters removed the wrap, noted some swelling but no deformity, and that plaintiff was walking well, including bearing his own weight.   Rather than dispute any of this, plaintiff instead maintains that he told Deters during their August 2nd encounter that he injured his ankle. As explained above, however, plaintiff's evidence in support is his August *11* HSR in which he first reported an ankle injury.   Obviously, this evidence does not support a finding that Deters was aware of plaintiff's injury earlier.   Moreover, since Deter's August 16 handling of plaintiff's ankle complaint does not suggest that he consciously disregarded or mistreated the injury, Nurse Deters is entitled to summary judgment on the merits of the claims against him as well.

---

[6] Since plaintiff's claim is based on "lies," Nurse Deters further asks that the court sanction plaintiff and award fees and costs for having to defend this case.   Although plaintiff's claims strain credulity, there is no evidence suggesting an intentional misrepresentation to this court.   Absent a formal motion and hearing on the question of sanctions -- an endeavor unsupported by the record and a further waste of the parties' resources -- this request will be denied.

ORDER

IT IS ORDERED that:

1. Defendants Dr. Syed, Scheuler, Hodge, Gaier, Valerius and Pafford's motion for summary judgment ('117 case, dkt. #54) is GRANTED.

2. Defendant Syed's motion for summary judgment ('332 case, dkt. #57) is GRANTED.

3. Defendant Deters' motions for summary judgment ('332 case, dkt. #62; '117 case, dkt. #49) are GRANTED.

4. Plaintiff's motion to compel (dkt. #87) is DENIED as moot.

5. The clerk of court is directed to enter judgment in defendants' favor in both cases and close them.

Entered this 27th day of July, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

23